Joshua B. Swigart (SBN 225557)
Josh@SwigartLawGroup.com
Juliana G. Blaha (SBN 331066)
Juliana@SwigartLawGroup.com
**SWIGART LAW GROUP, APC**
2221 Camino del Rio S, Ste 308
San Diego, CA 92108
P: 866-219-3343
F: 866-219-8344

Daniel G. Shay (SBN 250548)
DanielShay@TCPAFDCPA.com
**LAW OFFICE OF DANIEL G. SHAY**
2221 Camino del Rio S, Ste 308
San Diego, CA 92108
P: 619-222-7429
F: 866-431-3292

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEANIESHA LAWRENCE,<br><br>              Plaintiff,<br><br>vs.<br><br><br>BANK OF AMERICA, N.A.,<br><br>              Defendant. | Case No: 3:21-cv-00597-L-WVG<br><br>FIRST AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:<br><br>1. Electronic Funds Transfer Act<br>2. Federal Due Process Under the 14th Amendment<br>3. California Due Process Clause<br>4. California Consumer Privacy Act<br>5. California Customer Records Act<br>6. California Unfair Competition Law<br>7. Negligence & Negligence Per Se<br>8. Breach of Contract<br>9. Breach of Implied Contract<br>10. Breach of the Implied Covenant of Good Faith and Fair Dealing<br>11. Breach of Fiduciary Duty<br>12. Breach of Contract, Third-Party Beneficiaries<br>13. Breach of Implied Covenant of Good Faith and Fair Dealing, Third Party Beneficiaries |

## INTRODUCTION

2   1. Plaintiff Deaniesha Lawrence ("Ms. Lawrence" or "Plaintiff") brings this action related to California Unemployment Insurance ("UI"), Pandemic Unemployment Assistance ("PUA"), and other public benefits are or were paid through debit card issued by Defendant Bank of America, N.A. ("Bank of America" or "Bank"). Plaintiff alleges violations of the Electronic Funds Transfer Act, 15 U.S.C. §1693 et seq ("EFTA") and its implementing regulations at 12 C.F.R. Part 1005 ("Regulation E"), violations of the Due Process Clauses of the U.S. and California Constitutions, Breach of Contract, Negligence, and other state common law and statutory claims, to remedy Bank of America's egregious mal-administration of its obligations under the California Employment Development Department's ("EDD") benefits payment programs. In violation of its constitutional, statutory, common law, and contractual obligations to Plaintiff, the Bank has deprived Plaintiff of Plaintiff's statutory right to public benefits without prior notice or an opportunity to be heard, has failed to take reasonable steps to protect Plaintiff's benefits from fraud, and has otherwise failed to ensure that Plaintiff is able to receive and access the benefits to which Plaintiff is lawfully entitled.

## BACKGROUND

2. Like millions of other Californians, Plaintiff became unemployed during the COVID-19 pandemic. Plaintiff and other Californians applied for UI, PUA, and other public benefits through programs administered by California's EDD, and Plaintiff was found eligible by EDD to receive, and initially did receive, the benefits to which Plaintiff was lawfully entitled.

3. Pursuant to an exclusive contract between EDD and Bank of America, Plaintiff received periodic benefit payments not from EDD directly, but through a Bank-issued and Bank-administered prepaid debit card ("EDD Debit Card" or "Card"), which was linked to an individual Bank depository Account ("EDD Debit Card Account" or "Account"). Although the Bank was legally required to take necessary

and reasonable steps to protect Plaintiff's EDD Debit Card and Account from fraudulent access by third parties, the Bank failed to do so. Among other things, the Bank failed to secure Plaintiff's sensitive Card and Account information and issued Plaintiff an EDD Debit Card without the fraud-preventing EMV chip technology that the Bank has used on all its other debit and credit card since 2014. Instead, the Bank's EDD Debit Cards use outdated magnetic stripe technology, which makes them readily susceptible to cloning and other schemes that have allowed third parties to fraudulently use and access Plaintiff's EDD Debit Card and Account.

4. In addition to the Bank acting negligently and in breach of its statutory and common law obligations to Plaintiff by failing to protect Plaintiff's EDD Debit Card and Account, the Bank also has violated its statutory obligations to Plaintiff under the federal EFTA and other laws by not implementing adequate and reasonable systems, measures, and protections to permit prompt and effective identification of fraud, submission of fraud claims, provisional access to already approved benefits during the course of fraud investigations, prompt and accurate resolution of fraud claims, and prompt reimbursement of funds stolen from Accounts. For example, instead of providing an effective and timely process for Cardholders to report unauthorized transactions and submit fraud claims, the Bank adopted a series of "customer service" practices and policies that require Plaintiff to spend dozens of hours on telephone calls with customer service, and that have frustrated and obstructed efforts to submit fraud claims. When Cardholders persevere and finally reach the Bank's customer service representatives to report fraud on Accounts, the Bank then violates statutory, common law, and constitutional rights by denying fraud claims without investigation or explanation and freezing EDD Debit Card Accounts indefinitely, thereby depriving Cardholders access to past and future EDD benefits without any prior notice or an opportunity to be heard.

///

5. The cardholder agreement between Bank of America and Plaintiff sets forth the Bank's "Zero Liability" policy, which promises to protect Plaintiff from adverse financial consequences if Plaintiff's EDD Debit Card or Account are fraudulently used or accessed by third parties. The Bank has not implemented this policy as promised, which has caused Plaintiff to suffer significant financial losses from third-party fraud, including by the Bank failing to have reasonable procedures in place to identify and receive notifications of fraud, failing to adequately monitor its customer service, establishing procedures that frustrate and obstruct timely submission of fraud claims by Plaintiff and other Cardholders, closing fraud investigations without conducting reasonable and appropriate review, and failing to extend provisional credit to Plaintiff and other Cardholders as required by law while fraud investigations are underway or after fraud is, or reasonably should have been, determined. The Bank has also deprived Plaintiff of Plaintiff's constitutional rights to notice and an opportunity to be heard before causing Plaintiff's EDD Debit Card and Account to be frozen for extended periods of time, thereby depriving Plaintiff of access to past, present, and future disbursements of government benefits for which Plaintiff has been found eligible.

6. By the acts and omissions alleged here, Bank of America has violated federal and state constitutional due process protections; violated EFTA and its implementing Regulation E; violated California's Consumer Privacy Act, Customer Records Act, and Unfair Competition Law; acted negligently; and breached its cardholder agreement with Plaintiff, its contract with EDD (to which Plaintiff is an intended third-party beneficiary), the implied covenant of good faith and fair dealing under those contracts, and its fiduciary duties to Plaintiff. These acts and omissions have caused substantial financial and other harm to Plaintiff, and unless promptly enjoined will cause Plaintiff and the public to suffer immediate and irreparable harm.

///

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to: (a) 28 U.S.C. §1331 because this action arises under the federal Due Process Clause and the Electronic Funds Transfer Act, 15 U.S.C. §1693 et seq.; (b) 28 U.S.C. §1332(a) because Plaintiff and is a citizen of California, Bank of America is incorporated under the laws of Delaware and has its principal place of business in North Carolina, and the amount in controversy exceeds $75,000; and (c) supplemental jurisdiction under 28 U.S.C. §1367 with respect to the claims for relief arising under state law.

8. This Court has specific personal jurisdiction over Bank of America because the Bank has sufficient minimum contacts with California, has purposely availed itself of the benefits and protection of California law, and conducts a substantial amount of business in and with the State of California (including with EDD), such that the Court's exercise of personal jurisdiction over the Bank accords with due process.

9. Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial portion of the acts or omissions giving rise to the claims alleged occurred in this District, and because Bank of America is subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

10. Plaintiff Deaniesha Lawrence ("Plaintiff") resides in San Diego County, California. Plaintiff became out of work during the COVID-19 pandemic. Plaintiff then applied for and was found eligible by EDD to receive unemployment benefits. Plaintiff received a Bank of America EDD Debit Card with a magnetic stripe (but no EMV chip) to access EDD benefits. Plaintiff was then the victim of unauthorized transactions on her EDD Debit Card Account. Plaintiff promptly reported the unauthorized transaction(s) to Bank of America, which failed to comply with its legal obligations as alleged herein, causing Plaintiff to suffer immediate and irreparable injury.

///

11. Defendant Bank of America, N.A. ("Bank of America" or "Bank") is a financial institution incorporated in the State of Delaware and headquartered in North Carolina that conducts a substantial amount of business in California, including business pursuant to its exclusive contract with the State of California EDD to administer UI, PUA, and other benefit payments through EDD Debit Card and Account.

## GENERAL FACTUAL ALLEGATIONS

### A. The Bank's Contract with EDD

12. EDD is an agency of the State of California that is responsible for administering numerous benefits programs for low-income, unemployed, and other Californians, including programs providing unemployment insurance (UI) benefits, disability insurance benefits, paid family leave benefits, pandemic unemployment assistance (PUA) benefits, and pandemic emergency unemployment compensation (PEUC) benefits to Californians (collectively, "EDD benefits").

13. In 2010, Bank of America entered into an exclusive contract with EDD for the provision of Electronic Benefits Payment (EBP) services, including issuance of Bank of America EDD Debit Cards through which individuals entitled to receive EDD benefits could access those benefits.

14. On information and belief, Bank of America obtained that contract by falsely representing to EDD that it would provide "best-in-class" fraud monitoring.

15. Beginning in or about July 2011, EDD began distributing EDD benefits pursuant to its contract with Bank of America, under which the default means of distributing EDD benefits payments is through Bank-issued and Bank-administered EDD Debit Cards, rather than paper checks or other forms of payment.

16. In or about 2015, Bank of America submitted a response to EDD's Request for Proposals ("2015 RFP Response" or "2015 Proposal") to extend the scope and duration of the contract. The 2015 Proposal was accepted by EDD and incorporated by reference into a new contract for EBP Services entered into between EDD and

6

the Bank, with an initial term of August 1, 2016 through July 31, 2021 ("EDD-Bank Contract"). In its 2015 Proposal, the Bank represented that it had applied and would continue to apply "the most rigorous fraud detection procedures," including "the highest level of security and fraud safeguards" based on "multiple layers of extensive security" to ensure that EDD Debit Cardholders do not become the victims of fraud. The Bank's 2015 Proposal also represented that the Bank has provided and will continue to provide "fraud monitoring" as part of its "multi-faceted" approach to preventing and combatting fraud, and that it would provide "immediate response to emerging fraud trends" to ensure that fraudulent transactions would be "declined in real time." The 2015 Proposal further represented that the Bank would provide "industry best-in-class" fraud investigations services, "applying specialized processes and tools to resolve fraud," and that "Bank of America is committed to being at the forefront of fraud and data security strategies, benefiting the EDD and [EDD's] claimants."

17. In its 2015 Proposal, Bank of America also represented that it would fully protect EDD Debit Cardholders in case they do become victims of fraud. Specifically, Bank of America represented that it would comply with all EFTA and Regulation E requirements and timelines with respect to error resolution and provided assurance that EDD Debit Cardholders (which includes Plaintiff) "should feel comfortable in dealing with disputed transactions knowing that we extend our Zero Liability protection on dispute claims, including ATM and pinned POS transactions." The Bank described its error resolution process as follows:

> A Claimant can file a dispute by calling the Customer Service Center for complete instructions. . . . After selecting the 'dispute a transaction' option within our IVR, the account holder will immediately speak with a live representative who will further review the transaction and any other possible fraudulent transactions with the account holder. . . . Once a dispute is requested in our system, a

case will be created within our claims tracking system and tracked until final resolution. Per Regulation E, within 10 business days of the initial dispute, we will promptly correct the error. . . . If more time is needed, we will temporarily credit the account holder's account within 10 business days of the initiated dispute for the full disputed amount. There is no limitation or maximum to the credit amount provided. This will allow the account holder to use the funds while the claim is being resolved.

18. The Bank's 2015 Proposal also made representations about the "[s]uperb customer service" levels it would guarantee EDD Debit Cardholders, boasting that "[w]e set the bar high and pride ourselves on serving each caller with swift, responsive service," and providing assurances that "[l]ong call hold waits and busy signals are not tolerated at Bank of America. Your program's average speed of answer is 30 seconds and your average handle time is 230 seconds." Pursuant to the EDD-Bank Contract, the Bank promised, among other things, to provide an Interactive Voice Response (IVR) system and live Customer Service Representative (CSR) support available "24 hours a day, seven days a week." The Bank promised that live CSR agents would be available 24/7 to assist EDD Debit Cardholders with "[i]nvestigat[ing] transactions (fraud security, use)," "[p]rocess[ing] lost/stolen/damaged card reports," and "[c]heck[ing] on the Status of Disputed Transactions." The Bank further promised that "no call [would be] transferred to voicemail or automatically disconnected from the queue," that "calls [would] not [be] immediately placed on hold," that "the average wait time to speak to a live CSR" agent would be "no more than 30 seconds for 70 percent of the calls, and no more than two (2) minutes for all calls," and that the Bank would "monitor Customer Service calls to ensure quality service and address Customer complaints."

19. On information and belief, EDD entered into the EDD-Bank Contract because of, and in reliance on, the Bank's representations in its 2015 Proposal.

20. Pursuant to the terms of the EDD-Bank Contract, EDD and the Bank are engaged in a joint undertaking to administer the EDD benefits programs and distribute EDD benefits payments to eligible claimants through EDD Debit Card. These Card are the default payment method for EDD benefits, and EDD's website presents EDD Debit Card as the exclusive means of receiving EDD benefits.[1] EDD further promotes EDD Debit Card as "a fast, convenient, and secure way to get your benefit payments," and advertises the many purported benefits of EDD Debit Card: "Get your money sooner"; "Use it everywhere VISA is accepted (in stores, online, and by phone)"; "Withdraw cash at ATMs, banks, and stores with cash back options"; "Transfer funds to the financial institution of your choice at no additional cost"; "Be notified when a deposit is made to your card, or when you have a low balance"; and "Receive fraud protection from a Zero Liability Policy."[2]

21. EDD Debit Card and Accounts are an integral part of EDD's benefits distribution and administration system. Under the terms of the EDD-Bank Contract, those Accounts can only receive deposits from the EDD and do not allow commingling of benefits payments with other funds. The EDD-Bank Contract provides that the Bank "shall disburse to each claimant the entire amount the EDD authorizes" and "shall process all benefit payment amounts provided by the EDD without alteration or adjustment"

22. Pursuant to the EDD-Bank Contract, EDD and Bank of America work cooperatively to identify potentially fraudulently obtained EDD Debit Card Account. EDD and Bank of America have made joint decisions to freeze between approximately 344,000 and 405,000 such Accounts. In addition, since September

---

[1] 1 See, e.g., EDD website, Unemployment Insurance – After You File a Claim, https://www.edd.ca.gov/unemployment/After_you_Filed.htm#receive ("When your first benefit payment is available, you will receive a debit card in the mail."); EDD Website, Guide to Applying for Unemployment Benefits, https://unemployment.edd.ca.gov/guide/receive-benefits ("Benefit payments for Unemployment Insurance, Pandemic Unemployment Assistance (PUA), Disability Insurance, and Paid Family Leave are all made using the Bank Debit Card.").
[2] EDD website, Debit Card, https://www.edd.ca.gov/about_edd/The_EDD_Debit_Card.htm.

First Amended Complaint

2020, Bank of America has frozen another approximately 75,000 Accounts and informed EDD about those freezes. Once it freezes an EDD Debit Card Account, the Bank, if contacted by a customer seeking to unfreeze the Account, informs the affected cardholder that they must re-establish their identity and re-verify benefits eligibility with EDD before the Bank will unfreeze the Account—regardless of whether EDD itself has raised any question regarding the cardholder's identity or benefits eligibility. In many cases, the Bank maintains the freeze on a cardholder's Account even long after the EDD informs the cardholder that there is no need to re-verify benefits eligibility or confirms that the cardholder is eligible for benefits.

23. By authorizing the Bank to freeze Plaintiff's EDD Debit Card Account based on the Bank's own determination of potential benefits eligibility fraud, and by authorizing the Bank to require EDD Debit Cardholders to re-verify benefits eligibility with EDD as a necessary (but not sufficient) condition of unfreezing an Account, EDD has delegated to the Bank the responsibility and authority to determine when, why, and how to deny Cardholders access to benefits to which EDD has already found them entitled. The Bank accepted and has exercised that delegated authority, including by freezing the EDD Debit Card Accounts of at least 75,000 EDD benefits recipients and thereby suspending those individuals' public benefits.

24. The EDD-Bank Contract, which contains an express revenue-sharing agreement, creates a relationship of financial interdependency between EDD and Bank of America. Under the revenue-sharing agreement, the State of California benefits from delegating the administrative burdens of EDD benefits distribution to the Bank at no cost to the State, while the Bank benefits from collecting point-of-sale transaction fees and other fees from millions of EDD Debit Cardholders and vendors and from earning interest on funds loaded onto the EDD Debit Card while the funds remain unspent by cardholders, which revenues it shares with the State. At the same time, the EDD-Bank Contract relieves EDD of any liability for "fraud,

10

misuse, and lost or stolen debit card," leaving the Bank solely liable for such fraud, misuse, loss, or theft. This creates a financial incentive for the Bank to circumvent its EFTA and other legal obligations to provide provisional credit and permanent reimbursement for fraudulent transactions that occur in EDD Debit Card Account.

**B. The Bank's Failure to Secure Sensitive EDD Debit Cardholders Information**

25. Bank of America has failed to maintain, store, share, or transfer EDD Debit Cardholders' personally identifiable information, Card and Account data, and other financial data and information (collectively, "Cardholder Information") in a reasonably secure manner and consistent with the Bank's obligations to EDD and to Plaintiff and other Cardholders. As a result, Cardholder Information has been obtained by unauthorized third parties in a series of security breaches that have allowed millions of dollars to be stolen from Cardholders through unauthorized transactions. Bank of America's repeated and ongoing failure to secure Cardholder Information violated and continues to violate the California Consumer Privacy Act and the Bank's common law duty to take reasonable steps to protect Cardholder Information from unauthorized access, theft, or disclosure.

26. Some EDD Debit Cardholders who have had money stolen from their Debit Card Account through unauthorized transactions received and activated, but never used, their EDD Debit Card.[3] Such unauthorized transactions could only have occurred if Bank of America failed to store or transfer Cardholder Information in a reasonably secure manner.

**C. The Bank's Use of Outdated, Vulnerable Magnetic Stripe Technology**

27. To access their EDD benefits, EDD Debit Cardholders must send the Cardholder Information stored on their cards through a processing network operated by Visa.

---

[3] See, e.g., David Gotfredson, "California Unemployment: Fraudulent Charges Keep Popping up on Bank Debit Card Accounts," ABC10 Sacramento (KXTV) (Jan. 21, 2021), available at https:// www.abc10.com/article/money/fraudulent-charges-edd-debit-card-accounts/509-5a8b0958-0b56-41fe-81af-e3ce446d0690 (reporting that an EDD Debit Cardholder experienced fraud despite the fact that he "never . . . used the card" and "only used the account number to transfer money to [his] credit union").

The first step in that process occurs at the point of sale, where the card must either be swiped or inserted into a card reader. The reader obtains the Cardholder Information stored on the card and transmits it to the financial services provider through a computer network, either at the time of the transaction or later in a "batch" with other transactions.

28. From the 1960s through the last decade, magnetic stripes were the standard for storing consumer information on debit card and credit card in the United States. A magnetic stripe contains static data about the card, including the cardholder's name, the card number, and the card expiration date. This data is printed directly on the outside of the card and recorded on the magnetic stripe. When swiped through a reader, this data is collected and transmitted as part of the transaction process.

29. Because the data on a magnetic stripe are static and easily readable, magnetic stripe card are highly susceptible to fraud. One common method of stealing information from magnetic stripe card is called "skimming," a process by which a wireless transmitter affixed to a card reader collects the information on the magnetic stripe when the card is swiped or inserted and sends it to a nearby computer. The recipient can then use the information to easily clone the consumer's card, conduct unauthorized transactions, and access the bank account connected to the card.

30. Personal data on magnetic stripe card can also be captured by hackers on a large scale. For example, in 2013, hackers infiltrated the retailer Target's payment terminals and systematically captured the information of every swiped card for weeks, ultimately gathering the card information of tens of millions of people.[4] Card data collected in this manner can be sold on an underground market, where the stolen data can be used to make fraudulent purchases.

///

---

[4] Elise Hu, "Target Hack a Tipping Point in Moving Away from Magnetic Stripes," NPR (Jan. 23, 2014), available at https://www.npr.org/sections/alltechconsidered/2014/01/23/264910138/target-hack-a-tipping-point-in-moving-away-from-magnetic-stripes.

First Amended Complaint

31. Over the past decade, in an effort to stem the consumer fraud enabled by magnetic stripes, the financial services industry in the United States has adopted EMV chip technology as the industry standard. While magnetic stripes are "static," with the same card-identifying information provided for every transaction, EMV chips are "dynamic," meaning the data they contain can be interacted with, altered, and updated. An EMV chip creates a unique electronic signature for each transaction, making data from past EMV chip card purchases useless to would-be thieves, thereby significantly reducing the risk of unauthorized transactions.

32. In 2011, the same year the Bank began issuing EDD Debit Card, the Bank announced it would offer EMV chips in corporate credit card to U.S. business customers who regularly traveled outside the United States.

33. On September 30, 2014, the Bank announced that it would include chip technology on "all new and reissued" consumer debit card. In announcing this shift, a Bank of America executive stated that "chip technology is an important tool in increasing card security, and we want our customers to have the best possible experience when using their payment card." The executive added that the "new chip-enabled card will improve security of customers' transactions."[5]

34. In 2015, card issuers and processors began a nationwide shift to EMV chip card. By 2017, an estimated 855 million EMV chip card had been issued to U.S. consumers, and such card are now standard in the industry.

35. In 2015, card-issuing banks and payment networks stopped absorbing liability for fraudulent transactions. On October 1, 2015, retail merchants who did not have certified EMV chip readers became liable for fraudulent transactions if the consumer presented an EMV chip card. In essence, this meant liability for

///

---

[5] Bank of America Press Release, "Bank of America Begins Rollout of Chip Debit Card" (Sept. 30, 2014), BusinessWire, available at https://www.businesswire.com/news/home/20140930005292/en/Bank-of-America-Begins-Rollout-of-Chip-Debit-Card.

First Amended Complaint

1  consumer card fraud would fall on either the retailer or the card issuer, whichever

2  was the least compliant with the EMV protocol.

3  36. As stated on Bank of America's own website, EMV chip technology "has been

4  around for over 20 years and is the credit and debit card security standard in many

5  countries around the world. When purchases are made using the chip feature at

6  chip-enabled terminals, the transaction is more secure because of the process used

7  to determine if the card is authentic. This makes the card more difficult to

8  counterfeit or copy." Bank of America also assures its accountholders on its

9  website that "whether you use the magnetic str ipe or the chip to make your

10  purchase, you can have confidence in the protection and security features we

11  provide for all credit and debit Account."

12  37. Despite the fact that Bank of America has been well aware for many years that

13  EMV chip card are significantly more secure than magnetic stripe card and is the

14  "debit card security standard," and despite its representations to EDD that it will

15  "focus on claimants" while leveraging "rapidly evolving payment technology" and

16  staying "at the forefront of payments innovation," the Bank chose to issue EDD

17  Debit Card using old, vulnerable magnetic stripe technology to hundreds of

18  thousands of the most financially vulnerable Californians like Plaintiff. To this day,

19  the Bank continues to issue EDD Debit Cards with no EMV chip, notwithstanding

20  its announcement nearly seven years ago that it would include EMV chip

21  technology on all consumer debit card to help prevent fraud. Predictably, the

22  issuance of EDD Debit Cards without EMV chips led to rampant fraud, resulting

23  in the ongoing loss of millions of dollars in EDD benefits intended to assist

24  Californians who lost their jobs, including during the COVID-19 pandemic.

25  **D. The Bank's Contractual Promises and Representations to its Cardholders**

26  38. Bank of America represented to Plaintiff and other Cardholders, in its cardholder

27  agreement and on its website, that the Cardholders would not be responsible for

28  unauthorized transactions on EDD Debit Cards or Accounts because of the Bank's

14

"Zero Liability" policy, under which the Bank would fully protect them against, and would reimburse them for, any unauthorized transactions. The Bank also represented to Cardholders that they could call the Bank 24 hours a day 7 days a week to report any unauthorized transaction to live customer services representatives, and that the Bank would promptly investigate the transaction and determine whether it was unauthorized within 10 business days thereafter, except that if the Bank took longer than 10 days (but in no event longer than 45 days) to investigate the transaction, the Bank "will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation."

39. In the Bank's California Employment Development Department Debit Card Account Agreement ("Cardholder Agreement"), to which all EDD Debit Cardholders must agree, Bank of America sets forth the above promises in detail. The Cardholder Agreement has an effective date of March 1, 2018, and thus has been effective throughout Plaintiff's receipt of EDD benefits. The Cardholder Agreement states: "Under the Bank of America 'zero liability' policy, you may incur no liability for unauthorized use of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time . . . ." The Cardholder Agreement advises the cardholder to "contact us at the number listed below AT ONCE if you believe your Card has been lost or stolen or if you believe that someone may use of has used your PIN assigned to your card without your permission. Telephoning is the best way of keeping your possible losses down." The Cardholder Agreement requires cardholders to call or write to report an unauthorized transaction "no later than 60 days" after the Bank sent the statement on which the transaction appeared.

40. The Cardholder Agreement promises that Bank of America "will determine whether an error occurred within 10 business days" after an unauthorized transaction is reported. The Cardholder Agreement reserves the right to "take up to

45 days to investigate" if the Bank "need[s] more time," in which case the Bank promises that "we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation."

41. Bank of America represents to EDD Debit Cardholders that the Bank's customer service department representatives are continuously available to assist with suspected fraud. On Bank of America's EDD Debit Card FAQ webpage, in response to the question "What are the Bank of America EDD Debit Card Customer Service hours?" Bank of America claims that "[f]or your convenience," Bank of America's "dedicated customer service representatives are available 24 hours [a] day, 7 days a week" by phone. The webpage further explains that the Bank's customer service representatives can help with the following: "Resolve a question about your account statement," "Investigate transactions," "Process lost/stolen/damaged card reports," and "Request an emergency cash transfer." In its Cardholder Agreement, Bank of America advises EDD Debit Cardholders that "Telephoning is the best way of keeping your possible losses down." In addition, Bank of America provides each EDD Debit Cardholder with a "Quick-Reference Guide," which prominently states that "customer service is available 24/7."

**E. The Rampant Third-Party Fraud on EDD Debit Card Accounts**

42. In the spring of 2020, the COVID-19 pandemic devastated California's economy, and millions of workers lost their jobs due to business closures and mass layoffs. The state's unemployment rate skyrocketed from 3.9% in January 2020 to 16.4% in April 2020, following closure orders issued by Governor Gavin Newsom and county health officials. Industries such as hospitality, food service, retail trade, and educational services were especially hard hit.

///

///

///



**California unemployment claims**
Weekly average in thousands: 2009; 52 weeks ended 3/14; recent weeks.

SOURCE: DEPARTMENT OF LABOR

43. As a result, millions of Californians turned to the EDD unemployment benefits programs administered by Bank of America to pay bills and make ends meet. Since the start of the COVID-19 pandemic in March 2020, EDD has received at least 18.5 million claims for various unemployment benefits. In the first week of December 2020, EDD received 341,813 claims, a 600% increase from December 2019. Bank of America has issued more than 9 million EDD Debit Cards to individuals found by EDD to be eligible for unemployment benefits.

44. As widely reported in the media and as described by legislators who report having heard from thousands of constituents, tens of thousands of EDD Debit Cardholders have been the victims of fraud throughout the pandemic, resulting in tens of millions of dollars having been stolen from Plaintiff's Account, including through fraudulent ATM withdrawals, such as many Plaintiff experienced.

45. Countless EDD Debit Cardholders have reported hundreds and thousands of dollars stolen through unauthorized use of EDD Debit Cards. These unauthorized transactions have taken various forms, including massive ATM withdrawals in distant states and countries,[6] thousand-dollar charges at luxury vendors, and

---

[6] See, e.g., CBSLA Staff, "Bank of America Freezes EDD Accounts of Nearly 350,000 Unemployed Californians for Suspected Fraud," CBS Los Angeles (Oct. 29, 2020), available at https://losangeles.cbslocal.com/2020/10/29/bank-of-america-freezes-edd-accounts-of-nearly-350000-unemployed-californians-for-suspected-fraud/.

First Amended Complaint

repeated transactions with food delivery services. Regardless of how or where the fraud has been carried out, the Bank's EDD Debit Cards have proven highly susceptible to unauthorized use.

46. After criminals exploit the security vulnerabilities of the Bank's EDD Debit Cards and Accounts and misappropriate Card and Account information, that information can be sold on the dark web, allowing the buyer to engage in unauthorized use of funds belonging to Cardholders.[7]

47. Such rampant third-party fraud was readily foreseeable given the rapid growth of the number of new UI and PUA claims, as well as reports from early in the pandemic warning of the potential for fraud and exploitation of the UI and PUA benefits system by criminals. This fraud was entirely foreseeable. It is well known in the financial industry that crises, such as economic recessions, lead to an increase in scams, fraud, and other financial crimes. The early months of the Covid-19 pandemic in the United States—March through May 2020—made clear that the pandemic would be no exception. In late March 2020, the federal Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law, injecting $2.2 trillion of relief into the American economy, including $260 billion in increased unemployment benefits, and hundreds of billions of dollars more in one-time cash payments to taxpayers and forgivable Paycheck Protection Program (PPP) loans. This rapid influx of pandemic relief to individuals and businesses, combined with rapid growth in the number of new claims for UI, PUA, and other public benefits created a "perfect environment" for fraud that was widely reported in the American media,[8] and that led to a flood of warnings from government agencies and expert

---

[7] See *id.*

[8] Ari Shapiro & Martin Kaste, "The Pandemic Creates A Perfect Environment For New Types Of Fraud," NPR All Things Considered (May 21, 2020), https://www.npr.org/2020/05/21/860584461/the-pandemic-creates-a-perfect-environment-for-new-types-of-fraud (reporting experts saying that there was a "bonanza" and "gold rush right now" in pandemic-related financial crimes); Steve Inskeep & Martin Kaste, Washington State Hit Hard by Unemployment Fraud, NPR Morning Edition (May 22, 2020) ("scams thriving nationwide in the uncertain conditions created by the pandemic," including hundreds of millions of dollars lost by Washington state to fraudulent unemployment claims).

First Amended Complaint

nongovernmental organizations about major increases in malicious cyber activity and financial fraud, including fraud targeting government unemployment benefits and consumer banking and credit services.[9] Reporting during the early months of the pandemic also noted the major increases in fraudulent financial activity had, predictably, caused a corresponding increase in demand on customer service phone lines, causing many agencies and companies to hire additional customer service representatives.[10] Bank of America nonetheless failed to take reasonable measures to prepare for, prevent, or respond to the readily foreseeable fraud as relates to its EDD Debit Card and Account.

**F. The Bank's Evasive and Ineffectual Response**

48. Bank of America's ineffective response to the rampant fraud has taken various forms, including not answering the customer service phone lines it advises EDD Debit Cardholders to call; establishing "customer service" procedures that frustrate and obstruct Cardholders' efforts to file fraud claims; opening fraud claims and then closing them so soon thereafter that a full investigation could not have occurred; crediting funds and later debiting them without notice to the EDD Debit

---

[9] See, e.g., National Governor's Association, Memorandum To: All Governors Re: COVID-19 and Cybersecurity at 1 (Apr. 28, 2020) ("State agencies, critical infrastructure sectors, and the general public are experiencing waves of COVID-themed malicious cyber activity."); Greg Iacurci, "If there's coronavirus relief money, scammers will try and steal it," CNBC (May 6, 2020), https://www.cnbc.com/2020/05/06/scammers-are-looking-to-steal-your-coronavirusrelief-money.html ("Federal agencies like the IRS, Federal Trade Commission, Social Security Administration and FBI have warned consumers and business owners in recent weeks to be vigilant as fraudsters try to take advantage of them during the coronavirus pandemic," including by targeting government financial relief such as unemployment benefits); U.S. Dept. of Labor Press Release, U.S. Department Of Labor Issues Guidance And Reminders To States To Ensure Integrity Of Unemployment Insurance Programs (May 11, 2020), https://www.dol.gov/newsroom/releases/eta/eta20200511-1 (announcing new "targeted guidance and reminders . . .to help states guard against fraud and abuse of their unemployment insurance systems"); Mike Baker, "Feds Suspect Vast Fraud Network Is Targeting U.S. Unemployment Systems," The New York Times (May 16, 2020), available at https://www.nytimes.com/2020/05/16/us/coronavirusunemployment-fraud-secret-service-washington.html; AnnaMaria Andriotis & Orla McCaffrey, "Borrower, Beware: Credit-Card Fraud Attempts Rise During the Coronavirus Crisis," The Wall Street Journal (May 27, 2020), available at https://www.wsj.com/articles/borrower-bewarecredit-card-fraud-attempts-rise-during-the-coronavirus-crisis-11590571800 (reporting on the "big jump in attempted credit- and debit-card fraud since coronavirus shut down the U.S. economy" and that "[b]anks have increased their fraud projections for 2020").

[10] See, e.g., Baker, supra note 9 (phone calls reporting fraud "flooded" Washington state unemployment benefits agency and "forced the state to hire more people to answer the phones"); Andriotis et al., supra note 9 (cardholders of major credit card issuers experiencing difficulty "getting customer-service representatives on the phone to remove charges and replace card").

First Amended Complaint

Cardholder; failing to extend provisional credit to EDD Debit Cardholders; and indefinitely freezing the Account of EDD Debit Cardholders who call Bank of America to report third-party fraud on their Account.[11]

49.   At no point has Plaintiff received written communication— by mail, email, text, or otherwise—from the Bank regarding the ongoing widespread fraud affecting Plaintiff's EDD Debit Card and Account, or how defrauded Cardholders should proceed, even after the Bank froze hundreds of thousands of EDD Debit Card Accounts in a desperate and heavy-handed effort to protect its own interests from the effects of the fraud. The only option presented to Plaintiff has been to comply with Bank of America's instructions to call the customer service number on Plaintiff's EDD Debit Card in reliance on the Bank's representations of a "Zero Liability" policy and "24/7" customer service. Unfortunately, as Plaintiff has learned, Bank of America's representations were, and continue to be, false. Proceeding in accordance with the Bank's policies and recommendations offers scant hope of recovering stolen funds or getting one's Account unfrozen in any reasonable time.

50.   In late November 2020, flooded by complaints from defrauded constituents, 59 California lawmakers wrote a letter to Bank of America Chairman and CEO Brian Moynihan concerning the rampant fraud involving EDD Debit Card and Account, and the Bank's inadequate response. The letter states:

> "The only recourse that EDD and our offices can currently provide constituents is to call Bank of America when these problems occur. However, constituents report Plaintiff are unable to get through to your call centers, or when Plaintiff

---

[11] Kenny Choi, "Victims of Bank of America Bank Debit Card Fraud Tell Stories of Fake Charges, Long Waits, Closed Claims," KPIX–CBS SF Bay Area (Dec. 22, 2020), available at https://sanfrancisco.cbslocal.com/2020/12/22/victims-of-bank-of-america-edd-debit-card-fraudtell-stories-of-closed-claims-frustration-loss/.

First Amended Complaint

do, the issue is not resolved.… Many of our own staff have
also tried to reach Bank of America to no avail."[12]

### 1. The Bank's Policy and Practice of Making Fraud Difficult to Report

51. The Bank has prevented many Cardholders from being able to report fraud in a timely manner, or even at all. Notwithstanding the foreseeable spike in calls that would inevitably accompany the spike in UI and PUA benefits recipients, the Bank failed (and continues to fail) to appropriately staff its customer service call centers in a manner that would allow it to honor its contractual commitments under the EDD-Bank Contract and to provide reasonable levels of assistance to the volume of EDD Debit Cardholders seeking assistance during this pandemic. As a result, when attempting to report fraud or to inquire about potential fraud, Cardholders like Plaintiff have been kept on hold for hours, have been disconnected without warning, have waited long periods of time to speak with someone only to be told to call back later, have been transferred to various departments with no apparent end or sent to voicemail, have had to deal with unhelpful automated agents, and have unsuccessfully attempted to reach the Bank by email.

### 2. The Bank's Policy and Practice of Automatically Denying Fraud Claims Without Investigation or Explanation

52. Even when fraud is reported, the Bank has a policy and practice of automatically and summarily denying the fraud claims of EDD Debit Cardholders without adequate investigation or explanation. Pursuant to this policy and/or practice, Cardholders who file a fraud claim do not receive provisional credit pending investigation within the first 10 days after Cardholders file a claim (or ever). Instead, Cardholders receive a form letter from the Bank—often dated the very same day or within a day or two of the Cardholder's report of the unauthorized transactions—stating simply that the "claim has been closed." The form letter

---

[12] Philip Y. Ting, et al., Letter to Brian Moynihan (Nov. 24, 2020), available at
https://a19.asmdc.org/sites/a19.asmdc.org/files/pdf/b-letter-ceo-fnl.pdf.

First Amended Complaint

states, "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity. Any temporary credit that was applied to your account related to this claim, including any related reimbursement of fees, has been or will be debited from your account and reflected in your available balance, if any." The form letter does not provide any individualized information explaining what the Bank's investigation, if any, entailed, nor does it explain the basis for the Bank's determination.

53. That letter provides a number that Cardholders should call if they wish to "request that [the Bank] reopen your claim for further consideration," but EDD Debit Cardholders who call the Bank to make such a request are often given erroneous information or told they cannot be helped. Even those who submit detailed documentation to the Bank substantiating fraud claims, such as sworn statements, police reports, and documentary proof of their whereabouts at the time the fraudulent transactions occurred (e.g., that they were nowhere near the ATM from which funds were withdrawn) are often ignored and go months without receiving any update from the Bank on the status of claims. Some who submit additional information simply receive yet another form letter from the Bank summarily reaffirming without explanation the Bank's original decision denying the fraud claim.

54. On information and belief, the Bank adopted this policy and practice of automatically denying the fraud claims of EDD Debit Cardholders to circumvent its obligations under EFTA and Regulation E, which require the Bank to issue provisional credit within 10 days of a Cardholders' report of fraud, to complete a good-faith investigation of the claim within no more than 45 days, and thereafter to issue permanent credit absent a reasonable basis for believing no fraud occurred. In implementing this policy and practice, the Bank sought to protect its own financial interests at the expense of legitimate claimants whose life-sustaining public benefits had been stolen.

22

55. Moreover, the Bank implemented its policy and practice of automatically denying the fraud claims of EDD Debit Cardholders retroactively by rescinding "permanent" credits that the Bank had previously paid. Thus, Cardholders that had been "permanently" credited with the amount of the stolen funds and had been previously informed by the Bank that their fraud claims were favorably resolved suddenly and without explanation had that same amount debited from their EDD Debit Card Account, sometimes leaving their Account with a negative balance. As a result, when those Cardholders received their next EDD benefits payment deposit into the EDD Debit Card Account, they were not actually able to access those benefits because the new EDD benefits payments were simply credited against the negative balance in their Account that resulted from the Bank's actions.

### 3. The Bank's Policy and Practice of Automatically and Indefinitely Freezing Accounts When Cardholders Report Unauthorized Transactions

56. The Bank has an additional policy and practice of responding to EDD Debit Cardholders who report fraudulent transactions by automatically and indefinitely freezing their EDD Debit Card Account without any prior notice, explanation, or opportunity to be heard. Thus, many Cardholders have had the experience of reporting fraudulent transactions and receiving assurances from the Bank that it will cancel Plaintiff's old EDD Debit Card and issue a new one, only to discover that Plaintiff's new EDD Debit Card is useless because the Bank has frozen (or locked) Plaintiff's EDD Debit Card Account. The Bank implements this policy and practice without first offering the Accountholder an opportunity to withdraw any remaining funds still in the Account, thus depriving the Accountholder of access to any EDD benefits that may have been in the Account at the time. Moreover, because the Bank will not accept EDD benefits payments from EDD for deposit into a frozen Account, the Bank's freezing of an Account cuts off the affected EDD Debit Cardholder's access to the continuing EDD benefits to which the Cardholder is entitled. As a result, many EDD Debit Cardholders who are the victim of third-

party fraud, and who turn to the Bank for help, suddenly find themselves indefinitely deprived of access to all EDD benefits and treated as if they are the criminals.

57. Many such individuals have been frozen out of their EDD Debit Card Account for months on end, without any information as to when their Account will be unfrozen or how they can facilitate that unfreezing. Some EDD Debit Cardholders whose Account are frozen in this manner eventually receive notice weeks or months after the fact, but that notice simply states, "It has been determined that there may be irregular, unauthorized, or unlawful activities involved with the prepaid debit card issued to you. As a result . . . a freeze (or hold) has been placed on your account." The notice states that once the Bank freezes your Account, you "will be unable to use the prepaid debit card or access the money in your account." The notice further states that once the Bank freezes an Account, it "will not be available to receive any additional benefits that may be issued to you by [EDD]." The notice states, "If a conclusion is reached that there is no irregular, unauthorized, or unlawful activity on your account, your account will be unfrozen and your balance will become available in accordance with the terms of the card account agreement and state agency guidelines," but the notice does not advise the affected Cardholder as to what steps they can take to regain access to the Account.

58. Moreover, after Bank of America has frozen an EDD Debit Card Account in response to a report of transactional fraud, the Bank has a policy and practice of telling EDD Debit Cardholders they are required to re-establish their identity and re-verify eligibility with EDD as a condition of unfreezing the Account—even if EDD itself has not raised any question regarding the individual's identity or benefits eligibility. Bank of America imposes this onerous and unreasonable condition on Cardholders who report third-party transactional fraud regardless of whether there is a reasonable basis for suspecting them of having committed benefits eligibility fraud, and despite knowing that EDD's call center has been

24

completely overwhelmed by the surge in unemployment benefits recipients throughout the pandemic and that many individuals who call EDD will never get through. According to the State Auditor, EDD agents answered just 1.4% (697,132 of 50,251,351) of calls received in July 2020, and just 6.3% (230,301 of 3,649,193) of calls received in October 2020.

59. Even after Cardholders comply with this onerous and unreasonable step of contacting EDD and obtaining confirmation from EDD that they either do not need to re-verify or have successfully re-verified benefit eligibility, Bank of America still does not unfreeze their EDD Debit Card Account, continuing without explanation to deprive Cardholders of access to their EDD benefits and refusing to process their fraud claims or refund their stolen money, sometimes for months longer.

### 4. The Bank's Policy and Practice of Denying Meaningful Assistance to Resolve Fraud Claims or Unfreeze Accounts

60. Desperate and confused, EDD Debit Cardholders whose fraud claims have been summarily denied and/or whose EDD Debit Card Accounts have been suddenly frozen have spent months calling the Bank's customer service hotline, but to no avail.

61. The Bank has failed to appropriately staff its customer service call centers in a manner that would allow it to honor its contractual commitments under the EDD-Bank Contract and to provide reasonable levels of assistance to the volume of EDD Debit Cardholders seeking assistance during this pandemic. Further, the Bank has a policy and practice of failing to provide its customer service representatives the tools or authority to assist Cardholders who call seeking assistance in resolving fraud claims or unfreezing their Accounts. Although the Bank at some point in the Fall of 2020 hired additional customer service agents, on information and belief those newly hired customer service agents are not trained and are not empowered to investigate or resolve fraud claims, and the number of customer service agents

First Amended Complaint

continues to be too low to handle incoming calls, resulting in hours-long wait times if Cardholders can get through at all.

62. Despite the Bank's promise of 24/7 customer service, Plaintiff and other Cardholders have found themselves repeatedly kept on hold, sometimes for hours, waiting to speak to a live agent. Plaintiff and other Cardholders have been disconnected, hung up on, and treated rudely by overworked and overwhelmed agents. Plaintiff and other EDD Debit Cardholders often spend hours on hold with customer service, despite Bank of America having represented in its Cardholder Agreement that "[t]elephoning is the best way of keeping your possible losses down." Even when Plaintiff and other Cardholders do reach a customer service representative, those representatives are unable to offer any meaningful assistance, often conveying false information or contradicting one another.

63. The Bank's representatives also often provide erroneous information regarding the reason for the Account freezes. Countless Cardholders have been told that the Bank has no control over the freeze, that EDD is the entity responsible for the freeze, and that only EDD has the power to unfreeze EDD Debit Card Account.  But when Cardholders call EDD, EDD informs them that it has no control over their EDD Debit Card Account and that the freeze is entirely within the Bank's control. Even when Cardholders re-verify their identity with EDD and EDD confirms their eligibility for EDD benefits and Cardholders convey this information to the Bank, the Bank still does not unfreeze the Accounts. In some cases, EDD has recently resumed paying benefits to Cardholders, through paper checks, but Cardholders remain unable to access funds in their EDD Debit Card Accounts, which remain frozen.

64. The EDD has publicly stated that the responsibility to prevent fraud and address claims of unauthorized transactions lies entirely with Bank of America, stating on October 29, 2020 that EDD "has no direct access to debit funds on any Account"

///

26

and that those impacted by card issues should contact Bank of America.[13] The agency has stated that it has no means to intervene in Bank of America's procedures.

65. Bank of America's inadequate response to EDD Debit Cardholders' issues with fraud on Plaintiff's Card and Account results from the Bank's failure to adequately staff its customer-service and fraud-investigation departments, and from Bank procedures that are designed to, or that the Bank knows or reasonably should know will, frustrate and obstruct Cardholders' efforts to submit claims and obtain reimbursement under the EFTA and the Bank's "Zero Liability" policy.

66. Many EDD Debit Cardholders have characterized their efforts to obtain relief from the Bank for the wrongful conduct alleged herein as an "unofficial full-time job trying to get the money back." One defrauded EDD Debit Cardholder reported:

> "It's kind of like a nightmare … Every day I'm wondering what's more important. Do I get on the phone with the bank and try again so I have a place to sleep tomorrow, or do I just accept that I'm going to be on the street and focus on my job search? Because you can't do both."[14]

67. A Bank of America customer service worker, addressing the Bank's response to the influx of reports of third-party debit card fraud, stated:

> "We're actually no longer allowed to tell them a timeframe, because we have no clue … Every day, I talk to 30 people with the same story. I just pray for them after my shift, honestly."[15]

///

---

[13] Matt Fountain, "Bank of America Froze SLO County Residents' Unemployment Benefits Because of Fraud," San Luis Obispo Tribune (Dec. 17, 2020), available at https://www.sanluisobispo.com/news/local/article247729155.html.
[14] Lauren Hepler & Stephen Council, "How Bank of America Helped Fuel California's Unemployment Meltdown," CalMatters (Nov. 20, 2020), available at https://calmatters.org/economy/2020/11/how-bank-of-america-helped-fuel-californias-unemployment-meltdown/.
[15] *Id.*

First Amended Complaint

68. Bank of America's disregard for EDD Debit Cardholders' issues with fraud and the Bank's inadequate response is particularly astonishing in light of the representations it made to the State in its proposal to administer the EDD public benefits program, in which the Bank stated, "we pride ourselves on providing stellar customer service to every caller. Long call hold waits and busy signals are not tolerated at Bank of America."

69. Bank of America's decision to provide EDD cardholders with debit cards without EVM chips was a costly one for EDD benefit recipients like Plaintiff. Millions of dollars have been stolen from California's EDD card holders like Plaintiff, hundreds of thousands of accounts have been frozen and or locked out because of Bank of America's decisions. As of January 27, 2021, there were roughly 450,000 EDD Debit Card Accounts that remained frozen.[16] In the worst unemployment crisis in California's history, during an unprecedented pandemic, Bank of America left Plaintiff and hundreds of thousands of EDD benefit recipients stranded.

## **FACTS SPECIFIC TO PLAINTIFF**

**Plaintiff's Experiences Dealing with Bank of America's Customer Service and Trying to Obtain Reimbursement and to Unfreeze Plaintiff's Account**

70. Mid-December 2020, Plaintiff after giving birth to her child accessed her Bank of America EDD account to update her address information. It was then Plaintiff noticed that two transactions were made on her Bank of America EDD account without her permission.

71. The first transaction was made at an ATM and pulled $600.00 out of Plaintiff's Bank of America EDD account. The second transaction was made at a Department store for $18.00. The two transactions totaled $618.00 and left Plaintiff with zero money in her Bank of America EDD account.

---

[16] LAist: Bank of America says it lost hundreds of millions on California's unemployment fiasco: https://laist.com/2021/01/27/bank_of_america_says_it_lost_hundreds_of_millions_on_californias_unemployment_fiasco.php

72. After discovering the fraud, Plaintiff promptly notified Bank of America Claims Department of the fraudulent transactions. Bank of America did not issue any sort of refund or credit for the funds it allowed to be stolen from Plaintiff.

73. On December 24, 2020, shortly after her fraud report, Bank of America sent Plaintiff a letter that read in part;

> "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity. Any temporary credit that was applied to your account related to this claim, including an related reimbursement of fees, has been or will be debited from your account and reflected in your available balance, if any."

74. The Bank's letter dated December 24, 2020, admits that Plaintiff's account had been "the subject of fraud" and an error had occurred. It was required to correct the error within one business day under 15 U.S.C. §1693f(b).

75. Plaintiff was shocked the claim was denied shortly after Plaintiff informed Bank of America of the error. Plaintiff could not believe that a good faith investigation had taken place so quickly.

76. Plaintiff still attempting to communicate with Bank of America called the Bank countless times every week in efforts to re-open her claim and have her funds reimbursed.

77. In late December, Bank of America froze Plaintiff's Bank of America EDD account without notice preventing Plaintiff from accessing her desperately needed funds.

78. Plaintiff believed she would be protected and covered by Bank of America and was utterly disappointed when the Bank did not return or recredit the money to Plaintiff so she could provide for herself during the pandemic while it conducted a good faith investigation.

///

///

79. Plaintiff's initial notice to the Bank occurred well-within the sixty-day time limit imposed by 15 U.S.C. §1693f(a). Plaintiff reported the unauthorized transfer to the Bank many more times within sixty-days as outlined below.

80. The Bank continued to send Plaintiff periodic statements, as required by 15 U.S.C. §1693f(a). The statements confirmed and showed the unauthorized transfer.

81. Each time Plaintiff reported the unauthorized transfers to agents at the Bank, Plaintiff provided her name and other identifying information as required by 15 U.S.C. §1693f(a)(1). The agents were able to locate Plaintiff's account, but they would not help.

82. Plaintiff indicated to the Bank that she believed her EDD Account contained errors in the form of an unauthorized electronic fund transfers under 15 U.S.C. §1693f(f)(1) and provided the amount and date of the transfers per 15 U.S.C. §1693f(a)(2).

83. When Plaintiff reported the fraud, she explained that the transfers occurred by other persons than herself. She set forth the reasons for her belief that the transfers were unauthorized errors on the Bank's part and were fraudulent per 15 U.S.C. §1693f(a)(3).

84. Upon information and belief, the Bank did not conduct any investigation when Plaintiff reported the errors.

85. The Bank may have mailed Plaintiff the alleged results of an "investigation" and determination within ten business days of notice, in an attempt to satisfy 15 U.S.C. §1693f(a)(3), but the letter the Bank sent Plaintiff soon after the fraud notice was a form letter with no substantive information.

86. The Bank did not conduct a good faith investigation and did not provisionally recredit Plaintiff's account within ten business days after receiving notice of the unauthorized transfer as required by 15 U.S.C. §1693f(c).

87. In early January 2021, EDD started mailing Plaintiff's benefit checks directly to her. Plaintiff was grateful to EDD for sending her checks directly to her, and taking

30

Bank of America out of the equation, because if EDD deposited the benefit checks into her Account Plaintiff would not have been able to access the funds due to her Account being frozen.

88. Assuming the Bank had a valid reason for the freeze and needed to conduct an investigation, Plaintiff should have been able to access Plaintiff's funds, including the stolen $618.00, after ten days under the EFTA. But that was not the reality for Plaintiff. Plaintiff was held hostage by the Bank with the only option of calling the Bank repeatedly and being placed on hold for hours and hours.

89. Plaintiff reported the unauthorized transactions to the Bank in mid-December 2020. A good faith investigation by the Bank was required to be completed forty-five days later under 15 U.S.C. §1693f(c).

90. If the Bank determined in a good faith investigation during the forty-five period that an error did not occur, it was required to deliver or mail Plaintiff an explanation of its findings within three business days after the conclusion of that good faith investigation under 15 U.S.C. §1693f(c).

91. Instead, the Bank sent Plaintiff a form letter soon after she reported the fraud. This indicates the Bank had not performed any sort of investigation, much less a good faith investigation. The letter seemed to be an attempt to shield the Bank from liability.

92. In its letter dated December 24, 2020, Bank of America failed to enclose any supporting documents to support its position that Plaintiff had committed the fraud.

93. The Bank did not make a good faith investigation of the error. It did not have a reasonable basis for believing that Plaintiff's account was not in error per 15 U.S.C. §1693f(e)(1).

94. Initially, the Bank concluded that Plaintiff's account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to it at the time of its investigation per 15 U.S.C. §1693f(e)(2).

///

95. Plaintiff upheld her end of the Cardholder Agreement and the requirements of the EFTA and made consistent diligent efforts to report and recover the funds stolen from the Account. Plaintiff made many telephone calls reporting the fraud. In spite of this, Bank of America's customer service department never offered Plaintiff any meaningful response or assistance, but rather stymied Plaintiff's efforts at every turn.

## CAUSES OF ACTION
## FIRST CLAIM FOR RELIEF
## VIOLATIONS OF THE ELECTRONIC FUNDS TRANSFER ACT
## (15 U.S.C. §§1693 et seq & 12 C.F.R. §§1005.1 et seq)

96. Plaintiff repeats and incorporate by reference each and every allegation set forth above, as though fully set forth here.

97. Plaintiff brings this cause of action pursuant to the United States Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§1693 et seq and 12 C.F.R. §§1005.1–1005.20 (Regulation E of the EFTA).

98. Plaintiff provided notice to Bank of America within 60 days after Bank of America sent a period statement reflecting an unauthorized transaction (which is an "error" under Regulation E) thereby triggering the error resolution requirements of 15 U.S.C. §1693f and 12 C.F.R. §1005.11.

99. Bank of America violated 15 U.S.C. §1693f and Regulation E, 12 C.F.R. §1005.11 through its implementation of each of the following policies and/or practices:

   a. adopting and implementing policies and practices designed to circumvent the Bank's statutory and regulatory obligations under 15 U.S.C. §1693f and Regulation E, including by frustrating and obstructing Plaintiff's efforts to submit a fraud claim and by denying Plaintiff's fraud claim without investigation;

   b. not correcting an error within one business day after it determined an error occurred;

32

c.  not crediting Plaintiff for interest or fees it charged related to the error.

d.  not issuing provisional credit within the first 10 business days of Plaintiff reporting fraud despite having no intention of completing a good-faith investigation of the fraud claim within 10 business days, and despite not completing a good-faith investigation of Plaintiff's fraud claim within 10 business days;

e.  failing to conduct good-faith investigations into the error or unauthorized transaction that was timely reported by Plaintiff;

f.  failing to conduct a good faith investigation into the error or unauthorized transaction that was timely reported by Plaintiff within 45 days of the date that the alleged error or unauthorized transaction was reported;

g.  denying Plaintiff's claim of error without having conducted a good faith investigation and without providing an explanation of its findings;

h.  denying Plaintiff's claim of error without having a reasonable basis for concluding that Plaintiff's Account was not in error, and where the Bank could not reasonably have drawn its conclusion that no error occurred based on the evidence available to the Bank at the time;

i.  failing to credit Plaintiff's EDD Debit Card Account with interest on the amounts of the fraudulent transaction for the period during which Plaintiff was without access to the funds;

j.  freezing Plaintiff's EDD Debit Card Account in order to avoid the Bank's legal obligations and to prevent Plaintiff from accessing Plaintiff's funds.

100.In situations where Bank of America has violated Regulation E by failing to provisionally recredit Plaintiff's EDD Debit Card Account, the Bank has neither conducted a good faith investigation nor had a reasonable basis for believing that the Account was not in error. Plaintiff is therefore entitled to treble damages under 15 U.S.C. §1693f(e).

///

101. Bank of America knowingly and willfully concluded that Plaintiff's EDD Debit Card Account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the Bank at the time of its investigation. Plaintiff is therefore entitled to treble damages under 15 U.S.C. §1693f(e).

102. Bank of America violated EFTA and Regulation E by failing to limit Plaintiff's liability as required by 15 U.S.C. §1693m and 12 C.F.R. §1005.6(b)

103. Plaintiff provided notice to Bank of America less than two business days after learning of the fraudulent transactions that occurred in Plaintiff's EDD Debit Card Account. Under 12 C.F.R. §1005.6(b)(1), Plaintiff's liability is capped at $50 in these circumstances. Bank of America has subjected Plaintiff to far greater than $50 in liability through its wrongful conduct as alleged herein.

104. Under 12 C.F.R. §1005.6(b)(2), $500 is the maximum liability that may be imposed on an accountholder who does not provide notice to the financial institution within two business days after learning of a suspected unauthorized transaction. Bank of America has subjected Plaintiff to far greater than $500 in liability through its wrongful conduct as alleged herein.

105. Even if Plaintiff had not provided Bank of America with actual notice within two business days of learning of a suspected unauthorized transaction, Bank of America was on constructive notice, under 12 C.F.R. §1005.6(b)(5)(iii), of widespread unauthorized electronic funds transfers from EDD Debit Card Account since the beginning of the COVID-19 pandemic. Since that time, countless unauthorized fund transfers have occurred and continue to occur from those Accounts. The volume of calls from EDD Debit Cardholders to Bank of America's customer service to report unauthorized transactions has been, and continues to be, so great, and the Bank's customer service department is so understaffed, that the Bank routinely causes EDD Debit Cardholders to wait on hold for multiple hours. The widespread fraud specifically targeting EDD Debit Cardholders has been widely

///

reported in the media and has been the subject of significant attention from California legislators.

106. In no event should Plaintiff be liable for over $500 of damages under 12 C.F.R. §1005.6. Bank of America has violated 12 C.F.R. §1005.6 by imposing thousands of dollars of liability on Plaintiff.

107. As a direct and proximate result of Bank of America violations of Regulation E, Plaintiff has lost money.

108. For violations of the EFTA, Plaintiff, seeks the following relief:

    a. actual damages with interest;

    b. restitution of all EDD benefits funds improperly debited by Bank of America;

    c. statutory damages;

    d. treble damages pursuant to 15 U.S.C. § 1693f(e);

    e. incidental and consequential damages suffered due to Plaintiff's inability to pay bills or otherwise use Plaintiff's unemployment funds; and

    f. an injunction barring Bank of America from illegally debiting EDD benefits and otherwise violating EFTA and Regulation E.

<u>**SECOND CLAIM FOR RELIEF**</u>

<u>**VIOLATIONS OF FEDERAL DUE PROCESS UNDER**</u>

<u>**THE 14TH AMENDMENT**</u>

<u>**(42 U.S.C. §1983)**</u>

109. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

110. The Due Process Clause of the Fourteenth Amendment prohibits any state actor from "depriv[ing] any person of . . . property, without due process of law." U.S. Const. amend. XIV.

111. Every person who, under color of [law], subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the

1 Constitution and laws," is "liable to the party injured in an action as law [or] suit
2 in equity." 42 U.S.C. §1983.

3 112. For purposes of the actions alleged herein, Bank of America is a state actor and
4 acted "under color" of law because it is engaged in a joint undertaking with the
5 State to provide and administer UI and other EDD benefits under a mutually
6 beneficial relationship and because it performs a function that is both traditionally
7 and exclusively governmental.

8 113. Plaintiff's UI, PUA, and other EDD benefits are constitutionally protected property
9 interests.

10 114. By freezing Plaintiff's EDD Debit Card Account, Bank of America (1) cut off
11 Plaintiff's access to EDD benefits already deposited to Plaintiff's Account and (2)
12 suspended Plaintiff's receipt of any future EDD benefits to which Plaintiff may be
13 entitled.

14 115. Bank of America's policy and/or practice of automatically freezing Plaintiff's EDD
15 Debit Card Account when Plaintiff reported unauthorized transactions without
16 affording any prior notice or pre-deprivation hearing, or any prompt and
17 meaningful post-deprivation opportunity to be heard, violated Plaintiff's due
18 process rights under the Fourteenth Amendment to the U.S. Constitution.

19 116. For violations of The Due Process Clause of the Fourteenth Amendment, Plaintiff
20 seeks the following relief:

21 a. actual damages;

22 b. nominal damages;

23 c. restitution of all EDD benefits funds improperly frozen by Bank of America;

24 d. incidental and consequential damages suffered due to Plaintiff's inability to
25 pay bills or otherwise use Plaintiff's unemployment funds; and

26 e. an injunction barring Bank of America from freezing EDD Debit Card
27 Accounts without prior notice and a pre-deprivation hearing.

28 ///

First Amended Complaint

## THIRD CLAIM FOR RELIEF

## VIOLATIONS OF THE CALIFORNIA DUE PROCESS CLAUSE

## (Cal. Const. Art. I, §7(a))

117. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

118. The California Constitution's due process clause provides, "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws." Cal. Const. art. I, §7(a).

119. Plaintiff's EDD benefits are constitutionally protected property interests.

120. Bank of America's policy and/or practice of automatically and indefinitely freezing Plaintiff's EDD Debit Card Account when Plaintiff reported unauthorized transactions without affording any prior notice or pre-deprivation hearing, or any prompt and meaningful post-deprivation opportunity to be heard, violates Plaintiff's due process rights under the California Constitution. Plaintiff seeks the following relief:

    a. actual damages;

    b. nominal damages;

    c. restitution of all EDD benefits funds improperly frozen by Bank of America;

    d. incidental and consequential damages suffered due to Plaintiff's inability to pay bills or otherwise use Plaintiff's unemployment funds; and

    e. an injunction barring Bank of America from freezing EDD Debit Card Accounts without prior notice and a pre-deprivation hearing.

## FOURTH CLAIM FOR RELIEF

## VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT

## (Cal. Civil Code §§1798.100 et seq.)

121. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

///

122. The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§1798.100 et seq., imposes a duty on businesses to take reasonable steps to protect consumers' nonencrypted and nonredacted personal information, and provides a private right of action to consumers whose nonencrypted and nonredacted personal information has been subjected to unauthorized access and exfiltration, theft, or disclosure as a result of a defendant business's breach of its duty to take reasonable steps to protect that information.

123. Plaintiff is a "consumer" as defined in the CCPA.

124. Bank of America is a "business" as defined in the CCPA.

125. Bank of America directly or indirectly collected Plaintiff's personal information as defined in Cal. Civ. Code §1798.81.5(d)(1)(A), including but not limited to Plaintiff's first name or first initial, last name, and account number or credit or debit card number (including but not limited to Plaintiff's EDD Debit Card and Account numbers), in combination with any required security codes, access codes, or passwords that would permit access to Plaintiff's financial Account.

126. On information and belief, Bank of America collected, stored, and/or transmitted Plaintiff's personal information in a nonencrypted and nonredacted form or in some other form that permitted unauthorized third parties to access that information in violation of the CCPA.

127. Bank of America had a duty under CCPA to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff's personal information.

128. Bank of America breached its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff's personal information by, among other things:

   a. issuing an EDD Debit Card to Plaintiff with a magnetic stripe but without EMV chip technology;

   b. collecting Plaintiff's personal information in an unsecure manner;

38

c. transmitting Plaintiff's personal information in unencrypted or otherwise inadequately secured form or channels; and

d. storing Plaintiff's personal information or permitting said information to be stored on unsecured or inadequately secured data storage devices, including at EDD.

129. Bank of America further failed to implement and maintain reasonable security measures by transferring information regarding Plaintiff's EDD Debit Card to, and storing it on, unsecured or inadequately secured data storage devices, including at EDD.

130. As a direct and proximate result of Bank of America's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff's personal information, Plaintiff suffered unauthorized access and exfiltration, theft, or disclosure of Plaintiff's nonencrypted and nonredacted personal information. Plaintiff never authorized such disclosure of Plaintiff's personal information.

131. Bank of America knew or should have known that issuing EDD Debit Cards with magnetic stripes but without EMV chip technology was not a reasonable security procedure or practice appropriate to the nature of Plaintiff's personal information and that a data breach resulting in the unauthorized access and exfiltration, theft, or disclosure of Plaintiff's personal information was clearly foreseeable.

132. As a direct and proximate result of the unauthorized access and exfiltration, theft, or disclosure of Plaintiff's nonencrypted and nonredacted personal information, Plaintiff was injured and lost and/or continue to lose money or property, including but not limited to the monetary value of unauthorized transactions on the EDD Debit Card issued by the Bank, the loss of Plaintiff's protected privacy interests in the confidentiality and privacy of Plaintiff's personal information, nominal damages, and additional losses as described above.

///

First Amended Complaint

133. On January 25, 2021, Cardholders Stephanie Smith and Alan Karam, Plaintiffs in the ongoing class action *Yick et al v Bank of America, N.A.*, 21-cv-00376-VC, through their counsel, on behalf of themselves and all others similarly situated including Plaintiff, sent a letter to Bank of America's registered agent for service of process via FedEx, notifying Bank of America of its violations of Cal. Civ. Code §1798.150(a) and demanding that the Bank cure them. That letter was delivered by FedEx the following morning, on January 26, 2021. Bank of America did not respond to the letter, much less cure the noticed violations or provide Plaintiff with an express written statement that the violations had been cured and that no further violations would occur, within 30 days after receiving the letter. Thereafter, on March 1, 2021, Smith and Karam filed a Class Action Complaint in an action that has now been consolidated into *Yick*. As a result, statutory damages may be initiated against the Bank pursuant by Plaintiff pursuant to Cal. Civ. Code §1798.150(b).

134. On or about January 26, 2021, Cardholders Roland Oosthuizen and Rosemary Mathews, through their counsel, each submitted a notice to Bank of America pursuant to Cal. Civ. Code §1798.150(b) on behalf of themselves and all others similarly situated including Plaintiff, informing the Bank of its violations of the CCPA. The Bank did not cure those violations or provide Plaintiff with an express written statement that the violations have been cured and that no further violations shall occur, as required by the CCPA within 30 days after such notice. As a result, statutory damages may be initiated against the Bank pursuant by Plaintiff pursuant to Cal. Civ. Code §1798.150(b).

135. Plaintiff seeks relief under Cal. Civ. Code §1798.150(a), including but not limited to recovery of actual damages, statutory damages, injunctive relief, declaratory relief, its costs of suit, attorney's fees pursuant to Cal. Code Civ. Proc. §1021.5 or other appliable law, and any other relief the Court deems proper.

///

# FIFTH CLAIM FOR RELIEF

## VIOLATION OF THE CALIFORNIA CUSTOMER RECORDS ACT

### (Cal. Civil Code §§1798.80 et seq.)

136. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

137. To ensure that personal information about California residents is protected, the California Legislature enacted the California Customer Records Act, which requires businesses suffering a data breach to promptly notify all persons whose "unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code §1798.82.

138. Bank of America is a "business" within the meaning of Civil Code §1798.80(a).

139. Plaintiff is an "individual" within the meaning of Cal. Civ. Code §1798.80(d). Pursuant to Civil Code §§1798.80(e) and 1798.82(h), "personal information" includes an individual's name, social security number, driver's license or state identification card number, and debit card and credit card information. "Personal information" under Civil Code §1798.80(e) also includes address, telephone number, employment, and employment history.

140. Bank of America maintains computerized data that includes personal information of Plaintiff. The security of that data was breached, resulting in unauthorized third parties fraudulently accessing Plaintiff's EDD Debit Card Account.

141. The notification of such a breach required by Cal. Civ. Code §1798.82 must be made "immediately following discovery."

142. By failing to promptly notify Plaintiff that Plaintiff's unencrypted personal information had been acquired (or was reasonably believed to have been acquired) by unauthorized persons, Bank of America violated Cal. Civ. Code §1798.82.

143. The notification required by Cal. Civ. Code §1798.82 must be made in plain language, list the information that was or is reasonably believed to have been compromised, identify the date and time of the breach, state whether law

41

enforcement delayed the notice, provide a "general description of the breach incident," and provide the "toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a social security number or a driver's license or California identification card number."

144. Bank of America was required to provide the notification required by Cal. Civ. Code §1798.82 to over 500 persons including Plaintiff and was required to provide a sample copy of its notification to the California Attorney General.

145. Bank of America did not provide such notice, and thus did not provide notice "in the most expedient time possible and without unreasonable delay," as required by Cal. Civ. Code §1798.82.

146. Bank of America's conduct as alleged herein was reckless and/or deliberate.

147. Plaintiff was injured by Bank of America's violations of Cal. Civ. Code §1798.82. Bank of America's exposure of Plaintiff's personal information to unauthorized third parties resulted in Plaintiff losing access to EDD benefits to which Plaintiff was entitled; exposed Plaintiff to increased risk of identity theft; and reduced the value of Plaintiff's personal information. Bank of America's failure to promptly notify Plaintiff of the exposure of Plaintiff's personal information to unauthorized third parties as required by §1798.82 prevented Plaintiff from taking measures to prevent or mitigate these harms, including but not limited to by withdrawing or transferring funds from Plaintiff's Account before those funds were fraudulently removed or before the Account was frozen by Bank of America, and by closing the Account and placing credit alerts on Plaintiff's Account to reduce the risk of identity theft.

148. Plaintiff seeks all remedies available under Cal. Civ. Code §1798.84, including, but not limited to, actual damages and injunctive relief.

///

///

///

First Amended Complaint

## SIXTH CLAIM FOR RELIEF

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code §§17200 et seq.)

149. Plaintiff repeats and incorporate by reference each and every allegation set forth above, as though fully set forth here.

150. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code §§17200 et seq.

151. Bank of America's "unfair" acts and business practices include, among other things, the Bank's actions or inactions in:

a. failing to maintain, store, use, or transfer Plaintiff's EDD Debit Card and Account information in a secure manner;

b. failing to issue EDD Debit Card with EMV chips, despite having for years been aware of the risks associated with magnetic stripe technology;

c. failing to respond to the rise in demand for EDD benefits caused by or related to the COVID-19 pandemic by issuing chip card;

d. falsely representing to Plaintiff and EDD that it would provide "best-in-class" fraud monitoring;

e. failing to protect Plaintiff from fraud, including by failing to use readily available EMV chip technology in its EDD Debit Card rather than outdated magnetic stripe technology that the Bank knew was susceptible to fraud;

f. failing to provide reasonable or adequate customer service assistance to Plaintiff who complained of fraud, despite representing that such assistance would be available "24/7," and despite the Bank's awareness of rampant third-party fraud on EDD Debit Card and Account;

g. establishing "customer service" procedures designed to frustrate and obstruct Plaintiff from filing fraud claims;

///
///

43

h. failing to adequately investigate and resolve Plaintiff's claims of unauthorized transactions in a timely manner despite the Bank's promised "Zero Liability" policy for unauthorized transactions;

i. failing to extend provisional credit to Plaintiff when the Bank was unable to timely investigate and resolve Plaintiff's fraud claims;

j. automatically denying Plaintiff's claims of unauthorized transactions without investigation, explanation, or reasonable basis;

k. freezing Plaintiff's EDD Debit Card Account without a reasonable basis for believing that the Plaintiff had committed fraud, and for longer than it would reasonably take to investigate any such belief, all while failing to provide Plaintiff any reasonable means of contesting the purported basis for the Account freeze;

l. freezing Plaintiff's EDD Debit Card Account not to protect Plaintiff, but to protect the Bank's own interests; and

m. failing to provide reasonable or adequate customer service to Plaintiff when Plaintiff was seeking assistance in obtaining reimbursement for third-party fraud on Plaintiff's Account or helping Plaintiff access Plaintiff's frozen Account, despite the Bank's representation in its 2015 RFP Response that "[u]nemployment and disability payments are critical, often times providing claimants the ability to secure housing or purchase necessary medical prescriptions."

152. Bank of America's acts, omissions, and conduct as alleged herein are "unfair" under the UCL because those acts, omissions, and conduct offend public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff. The harm caused by Bank of America's conduct outweighs any potential benefits attributable to such conduct. There were reasonably available alternatives to further the Bank's legitimate business interests, including issuing EDD Debit Card with EMV chips and creating and implementing

44

procedures and resources adequate to timely conduct good-faith investigations into reported unauthorized transactions and to otherwise timely resolve reports of fraudulent activity on EDD Debit Card Account.

153. Bank of America has engaged in "unlawful" acts and business practices by violating the Due Process Clauses of the U.S. and California Constitutions and multiple laws, including the Electronic Funds Transfer Act, 15 U.S.C. §1693, and Regulation E; the California Consumer Privacy Act, Cal. Civ. Code §§1798.100 et seq.; the Gramm-Leach-Bliley Act, 15 U.S.C. §§6801 et seq.; the California Financial Information Privacy Act, Cal. Fin. Code §§4050 et seq.; the California Consumer Records Act, Cal. Civ. Code §§1798.80 et seq.; and its common law obligations as set forth herein.

154. Bank of America has engaged in "fraudulent" acts and business practices because it made false representations to EDD Debit Cardholders like Plaintiff that its prepaid debit cards are a "[f]aster, easier and more secure" way to receive benefit payments,[17] that Cardholders would incur "Zero Liability" for unauthorized transactions, that it would provide "dedicated customer service representatives" "available 24 hours a day, 7 days a week" to help "investigate transactions" and "process lost/stolen/damages card reports," and that it would issue provisional credits within 10 days if unable to complete its investigation and would complete all error investigations within 45 days. These false representations were likely to deceive, and did deceive, Plaintiff into (a) using the Bank's EDD Debit Card services to receive EDD benefits (instead of, for example, opting to receive EDD benefits by paper check) and (b) using the Bank's EDD Debit Card services with the level of ordinary care that a consumer would use with a credit or debit card, rather than with a level of hyper-vigilance that a reasonable person might exercise if Plaintiff knew that the card was highly susceptible to hacks, that the Bank would

---

[17] Bank of America prepaid website, EDD Debit Card, https://www.visaprepaidprocessing.com/EddCard (formerly at the URL: https://prepaid.bankofamerica.com/EddCard).

First Amended Complaint

not hold Plaintiff harmless for third-party fraud, and that the Bank would not offer Plaintiff meaningful customer service support in the face of such fraud but would instead keep Plaintiff on hold for hours and offer no solutions even after weeks and months of calls.

155. As a result of Bank of America's violations of the UCL, Plaintiff has suffered injury in fact and lost money or property, including but not limited to the funds lost to fraud that have not been reimbursed, any fees paid to Bank of America, and lost interest that would have accrued on funds during the period of time when the funds were unavailable due to Bank of America's failure to timely and adequately investigate claims of unauthorized transactions and other violations of the UCL.

156. Plaintiff is entitled to restitution and other equitable relief, including injunctive relief (a) prohibiting Bank of America from continuing its unfair, unlawful, and deceptive business practices, and (b) requiring Bank of America to take reasonable measures to prevent future unauthorized use of EDD Debit Card and Account, and (c) requiring Bank of America to ensure timely and adequate processing of EDD Debit Cardholders' claims regarding unauthorized or fraudulent use of their EDD Debit Card or Account.

## SEVENTH CLAIM FOR RELIEF
## NEGLIGENCE AND NEGLIGENCE PER SE

157. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

158. Bank of America owed a duty to Plaintiff to act reasonably to:

a. safeguard Plaintiff's UI and other EDD benefits;

b. protect Plaintiff from fraudulent access by unauthorized third parties to the funds paid into Plaintiff's EDD Debit Card Account, including by timely and accurately warning Plaintiff of suspicious activity in those Account;

///

///

c. protect Plaintiff from unreasonable interference with Plaintiff's right and ability to continue to collect, receive, and access the EDD benefits to which Plaintiff was entitled;

d. ensure that the Bank's customer service staffing levels, technology, and operations were capable of providing Plaintiff reasonably timely and effective customer service, including to address Plaintiff's concerns about fraudulent or unauthorized transactions related to Plaintiff's EDD Debit Card or Account;

e. provide Plaintiff reasonable and adequate notice that Plaintiff's EDD Debit Card and Account were at risk of being subject to unauthorized use or had been subjected to unauthorized use;

f. timely and adequately investigate and resolve Plaintiff's claims regarding unauthorized or fraudulent transactions; and

g. extend to Plaintiff provisional credit when Bank of America failed to timely resolve Plaintiff's fraud-related claims.

159. Bank of America breached its duty to Plaintiff by, among other things:

a. failing to transfer or store Plaintiff's EDD Debit Card and Account information in a secure manner;

b. failing to issue Plaintiff an EDD Debit Card with an EMV chip, despite having been well aware for years of the risks associated with magnetic stripe technology;

c. failing to protect Plaintiff from fraudulent access by unauthorized third parties to the funds paid into Plaintiff's EDD Debit Card Account, including by providing timely and accurate warnings of suspicious activity in the Account;

d. failing to respond to the dramatic increase in EDD benefits and EDD benefits recipients caused by or related to the COVID-19 pandemic by issuing EDD Debit Cards with EMV chips to all new and existing EDD Debit Cardholders

///

and by taking other reasonably prudent security measures to prevent fraudulent and unauthorized transactions;

e. failing to ensure its customer service operation was capable of providing reasonably timely and effective assistance to Plaintiff, including when Plaintiff was the victim of fraudulent or unauthorized transactions;

f. failing to give reasonable and adequate notice to Plaintiff that Plaintiff's EDD benefits were and remain at risk of being vulnerable to fraudulent and unauthorized transactions;

g. failing to process Plaintiff's claims regarding fraudulent or unauthorized transactions in a reasonable timely and adequate manner, including by unreasonably automatically freezing Plaintiff's Account without prior notice, reasonable investigation, or an opportunity to be heard; and

h. failing to extend provisional credit to Plaintiff when Bank of America failed to resolve Plaintiff's claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner.

160. Bank of America's misconduct concerning its failure to safeguard Plaintiff's funds is inconsistent with industry standards, which prescribe using EMV chip technology in debit card.

161. Bank of America's misconduct concerning its failure to adequately protect Plaintiff's data is inconsistent with its obligations under the California Consumer Privacy Act, Cal. Civ. Code §§1798.100 et seq., the Gramm-Leach-Bliley Act, 15 U.S.C. §§6801 et seq., the California Financial Information Privacy Act, Cal. Fin. Code §§4050 et seq., the California Consumer Records Act, Cal. Civ. Code §§1798.80 et seq., and customary industry practice, as well as its own policies and procedures for its non-EDD debit and credit card Account, each of which are secured through EMV chip technology. Plaintiff is within the classes of persons that each of the aforementioned statutes are designed to protect, and Bank of

///

48

America's conduct caused the precise harm to Plaintiff that each statute was designed to prevent.

162. Bank of America's failure to comply with the California Consumer Privacy Act, Cal. Civ. Code §§1798.100 et seq., the Gramm-Leach-Bliley Act, 15 U.S.C. §§6801 et seq., the California Financial Information Privacy Act, Cal. Fin. Code §§4050 et seq., and the California Consumer Records Act, Cal. Civ. Code §§1798.80 et seq. constitutes negligence per se.

163. The harms inflicted upon Plaintiff were reasonably foreseeable because the Bank was and is well aware of the security risks associated with magnetic stripe technology, and knew or should have known that its customer service resources and/or procedures were insufficient to consider, evaluate, and appropriately resolve issues stemming from the significant increase in EDD benefits and EDD benefits recipients due to the sharp rise in unemployment in the State of California caused by or related to the COVID-19 pandemic, as well as the well-publicized sharp rise in financial fraud during the COVID-19 pandemic, both of which would foreseeably lead to an increased demand for customer service by Cardholders for all purposes, including for the purpose of reporting and attempting to resolve claims of fraudulent or unauthorized transactions. As a direct and proximate result of Bank of America's misconduct, Plaintiff has been deprived of Plaintiff's EDD benefits and has failed to receive accrued interest thereon.

## EIGHTH CLAIM FOR RELIEF
## BREACH OF CONTRACT

164. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

165. Plaintiff entered into a Cardholder Agreement with the Bank that requires the Bank to administer EDD benefits to Plaintiff through a prepaid debit card.

///

///

49

166. The Cardholder Agreement provides, among other things:

> Under the Bank of America 'zero liability' policy, you may incur no liability for unauthorized use of your Card up to the amount of the transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use, subject to the following terms and conditions… We will determine whether an error occurred within 10 business days after we hear from you — and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation.

167. The Cardholder Agreement also provides that the Bank "will add funds to your Account . . . in accordance with instructions from the EDD" and that "[f]unds are available for your use on the day we have been instructed by the EDD to fund your Account." The Agreement also limits the circumstances under which the Bank may deprive EDD Debit Cardholders of access to funds by freezing their EDD Debit Card Accounts. As relevant here, the Cardholder Agreement provides that if the Bank "suspect[s] irregular, unauthorized, or unlawful activities may be involved" with the Account, it may freeze the Account, but only "pending an investigation of such suspected activities."

168. Plaintiff performed all or substantially all of the material requirements that Plaintiff's Cardholder Agreement with Bank of America imposed on Plaintiff, and Plaintiff fulfilled all conditions precedent to Bank of America's performance, including, among other things, by contacting or attempting to contact Bank of America to reimburse Plaintiff for fraudulently appropriated funds within the time specified in the Cardholder Agreement.

169. Bank of America breached its promises to Plaintiff in its Cardholder Agreement by, among other things:

50

a. failing to timely investigate and resolve Plaintiff's fraud claims;

b. failing to reimburse Plaintiff for unauthorized transactions;

c. failing to provide Plaintiff with provisional credit when the Bank's investigation into Plaintiff's fraud claims exceeded 10 business days;

d. failing to limit Plaintiff's liability for unauthorized transactions;

e. freezing Plaintiff's EDD Debit Card Account without a reasonable basis for suspecting irregular, unauthorized, or unlawful activities in the Account, and beyond the length of time necessary for a reasonable investigation;

f. freezing Plaintiff's EDD Debit Card Account for reasons other than those specified in the Cardholder Agreement;

g. failing to make funds available to Plaintiff for Plaintiff's use on the day the Bank was instructed by the EDD to fund Plaintiff's Account; and

h. otherwise failing to make funds available to Plaintiff in accordance with EDD's instructions.

170. Plaintiff was harmed by Bank of America's conduct and has suffered actual damages in an amount equal to the difference in the value of the banking services for which Plaintiff provided valuable consideration and the banking services Plaintiff received.

## NINTH CLAIM FOR RELIEF
## BREACH OF IMPLIED CONTRACT

171. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

172. Bank of America agreed to and was obligated to take reasonable steps to ensure that EDD Debit Card Accounts were secure against unauthorized transactions and that any claims regarding unauthorized transactions were adequately investigated and resolved.

173. All parties understood that such protections and customer service obligations were integral and essential to Bank of America's business.

51

174. Bank of America was obligated to provide Plaintiff with EDD Debit Card services that were suitable for Plaintiff's intended purpose of preserving and accessing EDD benefits as needed (rather than providing debit card services that failed to take reasonable steps to safeguard Plaintiff's money), Bank of America failed to warn or notify Plaintiff that Plaintiff's EDD Debit Card or Account was at risk of unauthorized use, and failed to adequately investigate or resolve Plaintiff's claims regarding unauthorized transactions.

175. Bank of America did not take reasonable steps to protect Plaintiff's deposited funds from unauthorized transactions or to adequately investigate or resolve claims regarding unauthorized transactions. In fact, Bank of America willfully violated those interests by electing to issue EDD Debit Cards with outdated magnetic stripe technology, which it knew to be uniquely vulnerable to fraud, rather than using the same EMV chip technology that the Bank has included in all of its other consumer credit card and debit card for more than six years, for the express purpose of protecting against fraud.

176. Because Bank of America failed to take reasonable steps to protect Plaintiff's funds from being appropriated through unauthorized transactions and failed to take reasonable steps to timely or adequately respond to Plaintiff's claims regarding unauthorized transactions, Bank of America breached its implied contract with Plaintiff.

177. Bank of America's failure to fulfill its obligations to take reasonable steps to protect Plaintiff's funds from being appropriated through unauthorized transactions, and its failure to take reasonable steps to timely or adequately respond to claims regarding unauthorized transactions resulted in Plaintiff receiving banking services that were of less value than Plaintiff provided consideration for.

///

///

///

52

# TENTH CLAIM FOR RELIEF
## BREACH OF IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

178. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

179. There is a covenant of good faith and fair dealing implied in every contract and every implied contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. To fulfill its covenant, a party must give at least as much consideration to the interests of the other party as it gives to its own interests.

180. The covenant of good faith and fair dealing implied in the Bank's Cardholder Agreement with Plaintiff obligated the Bank, at a minimum:

   a. to take reasonable and necessary steps to safeguard Plaintiff's EDD benefits, including in light of the foreseeable and actual rise in the number of EDD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic;

   b. to ensure that its customer service operation was capable of providing reasonably adequate and effective assistance to Plaintiff who experienced fraud on Plaintiff's EDD Debit Card or Account;

   c. to warn or notify Plaintiff that Plaintiff's public benefit funds were subject to, or at risk of being subject to, actual or suspected unauthorized use;

   d. to timely and adequately investigate and resolve Plaintiff's claims of unauthorized transactions involving Plaintiff's EDD Debit Card or Account;

   e. to extend provisional credit to Plaintiff when Plaintiff's fraud claims were not timely resolved;

   f. to freeze Plaintiff's EDD Debit Card Account only to protect Plaintiff from third-party fraud and only for the period necessary to conduct a reasonable investigation into whether third-party fraud occurred;

53

g. to make EDD benefits deposited into Plaintiff's Account immediately available to Plaintiff and not to freeze Plaintiff's Account without a reasonable basis for believing that the Plaintiff had committed fraud; and

h. to not freeze Plaintiff's Account out of concern for the Bank's own potential liability for third-party fraud.

181. Bank of America breached the implied covenant of good faith and fair dealing by, among other things:

a. failing to take reasonable and necessary steps to safeguard Plaintiff's benefits, including but not limited to:

    i. failing to issue Plaintiff an EDD Debit Card with EMV chip technology;

    ii. failing to secure Plaintiff's EDD Debit Card and Account information and other sensitive personal information that could be used by third parties to effect unauthorized transactions;

    iii. failing to adequately monitor for fraudulent or suspected fraudulent transactions on Plaintiff's EDD Debit Card and Account; and

    iv. failing to promptly issue Plaintiff an EDD Debit Card with an EMV chip and to increase its efforts with respect to securing personal information, fraud monitoring, and otherwise safeguarding benefits in light of the foreseeable and actual rise in the number of EDD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic.

b. failing to ensure its customer service operation was capable of providing effective assistance to Plaintiff who experience fraud on Plaintiff's EDD Debit Card or Account, including during the COVID-19 pandemic;

c. failing to warn or notify Plaintiff that Plaintiff's EDD benefits were and remain subject to, or at risk of being subject to, actual or suspected unauthorized use;

*///*

First Amended Complaint

d.  failing to timely or adequately process and investigate Plaintiff's claims regarding unauthorized transactions;

e.  failing to extend provisional credit to Plaintiff when Plaintiff's fraud claims were not timely resolved;

f.  freezing Plaintiff's EDD Debit Card Account without a reasonable basis for believing that Plaintiff had committed fraud, and for longer than it would reasonably take to investigate any such belief;

g.  failing to provide Plaintiff any reasonable means of contesting the Bank's purported basis for freezing Plaintiff's EDD Debit Card Account or for otherwise having Plaintiff's Account unfrozen; and

h.  freezing Plaintiff's EDD Debit Card Account not to protect Plaintiff, but rather to protect the Bank itself, from liability for third-party fraud.

182. As a direct and proximate result of Bank of America's breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered actual losses and damages.

## ELEVENTH CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY

183. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

184. Plaintiff, as public benefits recipient, is a member of a uniquely vulnerable segment of the population, who depend on the prompt and accurate payment of the UI, PUA, and other EDD benefits to obtain basic necessities of life, including food and shelter.

185. When Plaintiff submitted claims for UI, PUA, and other EDD benefits to EDD and was found eligible to receive those benefits, Plaintiff was not given the choice of receiving those benefits through debit card issued by any financial institution other than Bank of America. Bank of America holds the exclusive contract to implement and administer EDD's public benefits programs and is the only financial institution

55

authorized to pay EDD benefits to program beneficiaries through the use of bank-issued prepaid debit cards.

186. In order to obtain the Bank-issued EDD Debit Card needed to access Plaintiff's EDD Debit Card Account, which is the default way of receiving EDD benefits, Plaintiff was required to provide a broad range of private and confidential information, including information pertaining to Plaintiff's income, public benefits, employment status, finances, social security numbers, addresses, email address, telephone number, and all debit card account information.

187. The Bank, in turn, was provided access to all such personal, confidential, and financial information from Plaintiff, which the Bank stored and maintained, purportedly in confidence, and which the Bank was required to strictly maintain in confidence without public access or other disclosure absent the EDD Debit Cardholders' written consent. The Bank was also delegated the responsibility and authority to determine when, why, and how to deny Plaintiff access to EDD benefits, to which Plaintiff was entitled, by freezing Plaintiff's EDD Debit Card Account.

188. Plaintiff, as an EDD benefits recipient who did not opt out of the default option of receiving Plaintiff's EDD benefits payments through EDD Debit Card, was repeatedly assured that an EDD Debit Card was a "[f]aster, easier and more secure" way to receive Plaintiff's benefit payments and that the EDD Debit Card and Account were secure from fraud, and Plaintiff placed Plaintiff's trust and confidence in the Bank at all material times, including with respect to all of Plaintiff's personal, confidential, and financial information and with respect to the Bank's ongoing maintenance of that information in confidence, without secretion or divulgence absent Plaintiff's express written consent.

189. Bank of America owed, and continues to owe, a fiduciary duty to Plaintiff. By virtue of its position as the financial institution charged with implementing EDD benefits programs, which gave the Bank delegated authority to determine when,

why, and how to deny Plaintiff access to EDD benefits to which Plaintiff is entitled by freezing Plaintiff's EDD Debit Card Account, and by virtue of its unbridled access to Plaintiff's personal, confidential, and financial information, and because of the Bank's superior knowledge, business responsibilities and duties—including those provided by law or statute— and its absolute ability to control or otherwise manipulate Plaintiff's EDD Debit Card Account data in its system, the Bank assumed a fiduciary duty to Plaintiff not to deny access to Plaintiff's Account funds without reasonable basis, and to secure and maintain the personal, confidential, and financial information that it received from Plaintiff, free from unauthorized intrusion, theft, or other disclosure.

190. As a result of this relationship of trust and confidence, the unique nature of Plaintiff's EDD Debit Card Account that contains only EDD benefits, the highly confidential nature of the records and data pertaining to Plaintiff's EDD Debit Card Account, and the Bank's duties to maintain the privacy of such information, the Bank owed Plaintiff the highest degree of loyalty, honesty, fidelity, trust, and due care in its fiduciary obligations with respect to ensuring Plaintiff was not denied access to Plaintiff's Account funds, and with respect to securing and maintaining the privacy of Plaintiff's personal, confidential, and financial data in the Bank's possession. In order to comply with such duty, the Bank was required to use its utmost ability to ensure that Plaintiff was not denied access to Plaintiff's Account funds, and to protect, preserve, and secure Plaintiff's private data and confidential information from unauthorized access, fraud, or theft and to take all necessary steps in order to do so, including encrypting such information and deploying sufficient data access security controls, EMV chips, and other measures, to frustrate and disable hackers, skimmers, cloners, or others from accessing such information for their personal profit or unlawful goals.

191. Based on the acts or omissions alleged above, Bank of America breached its fiduciary duties to Plaintiff by failing to take all adequate and necessary steps to

57

ensure Plaintiff was not denied access to Plaintiff's Account funds without a reasonable basis, and to preserve, secure, and maintain the confidentiality and privacy of Plaintiff's EDD Debit Card and Account and Plaintiff's personal, confidential, and financial data. The Bank independently breached its fiduciary duties to Plaintiff by failing to timely, fully, and adequately disclose that it had not taken the necessary steps to protect Plaintiff's information from unauthorized or fraudulent access and theft and that Plaintiff's information was at a heightened risk of breach by virtue of the Bank's data security failings and policies.

192. Bank of America recklessly or knowingly breached its fiduciary duty and consciously denied Plaintiff's access to Plaintiff's EDD Debit Card Account funds without reasonable basis, and it created an environment that made its data systems and Plaintiff's EDD Debit Card Account and Plaintiff's access to EDD benefits prey to criminal hackers and thieves. Alternatively, and without prejudice to the foregoing, the Bank also breached its fiduciary duty by placing its own desire to achieve greater profits ahead of the financial security, privacy, and data security interests of Plaintiff.

193. As a direct and proximate result of the Bank's violations of its fiduciary duty, Plaintiff has been injured and has suffered and will continue to suffer economic and non-economic losses in an amount to be determined according to proof at trial, and a constructive trust has been formed in which the Bank is an involuntary trustee for the benefit of Plaintiff concerning the Account funds that Plaintiff has lost or has been unable to access.

## TWELFTH CLAIM FOR RELIEF
## BREACH OF CONTRACT (THIRD-PARTY BENEFICIARIES)

194. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

195. Bank of America and the State of California EDD entered into the EDD-Bank Contract, which is a valid and legally enforceable contract that requires Bank of

58

America to administer EDD benefits to Plaintiff through an EDD Debit Card and Account.

196. In seeking to obtain the Bank-EDD Contract and as a material term of that contract, the Bank represented to EDD that the Bank would protect the EDD benefits deposited into EDD Debit Card Accounts by implementing strict and secure anti-fraud measures, and that it would provide reasonable and adequate customer service to EDD Debit Cardholders sufficient to ensure that any claims of fraud would be promptly considered, fully and fairly investigated, and timely resolved without hardship or cost to blameless Cardholders, including Plaintiff.

197. As an EDD benefits recipient, EDD Debit Cardholder, and EDD Debit Card Accountholder, Plaintiff is an intended third-party beneficiary of the EDD Bank Contract. Plaintiff would benefit from performance of the contract, providing that benefit was a motivating purpose of the contracting parties entering into the contract and permitting Plaintiff to pursue a claim for breach of the contract seeking specific performance is consistent with the contract's objectives and the reasonable expectations of the contracting parties at the time of contracting.

198. Plaintiff, and the EDD performed all or substantially all of the material conditions imposed on them by the Bank-EDD Contract and fulfilled any and all conditions precedent to Bank of America's performance.

199. Bank of America failed to perform as promised in the Bank-EDD Contract by, among other things:

    a. failing to take adequate steps to prevent fraud on Plaintiff's EDD Debit Card and Account, including but not limited to failing to adequately monitor for fraudulent and suspected fraudulent transactions, failing to adequately detect fraudulent and suspected fraudulent transactions, failing to deploy reasonable and adequate technologies and human resources to monitor for and detect fraudulent and suspected fraudulent transactions, failing to promptly notify Plaintiff of Bank-detected fraudulent or suspected fraudulent transactions, and

failing to issue Plaintiff an EDD Debit Card that incorporates EMV chip technology;

b. failing to timely perform good-faith investigations of unauthorized transactions involving Plaintiff's EDD Debit Card and Account;

c. failing to timely resolve Plaintiff's claims of unauthorized transactions involving Plaintiff's EDD Debit Card and Account, including failing to have a reasonable basis for its determination that challenged transactions were in fact authorized by Plaintiff;

d. failing to timely reimburse Plaintiff for unauthorized transactions on Plaintiff's EDD Debit Card and Account;

e. failing to timely provide provisional credit to Plaintiff when the Bank's investigation of fraud claims exceeded 10 business days;

f. failing to provide Plaintiff with the kind, level, amount, and quality of customer service specified in the EDD-Bank Contract; and

g. failing to make commercially reasonable efforts in the context of the COVID-19 pandemic to provide the kind, level, amount, and quality of customer service to Plaintiff that reasonably should have been provided in the context of the COVID-19 pandemic

200. Plaintiff was harmed by Bank of America's conduct in breaching the EDD-Bank Contract and has suffered actual damages in an amount equal to the difference in the value of the banking services that Plaintiff was contractually entitled to receive and the value of banking services that Plaintiff actually received.

## THIRTENTH CLAIM FOR RELIEF
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
## (THIRD-PARTY BENEFICIARIES)

201. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

60

202. There is a covenant of good faith and fair dealing implied in every contract and every implied contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other party or intended third-party beneficiaries to receive the benefits of the agreement. To fulfill its covenant, a party must give at least as much consideration to the interests of the other party as it gives to its own interests.

203. The covenant of good faith and fair dealing implied in the EDD-Bank Contract obligated the Bank, at a minimum:

    a. to take reasonable and necessary steps to safeguard Plaintiff's benefits, including in light of the foreseeable and actual rise in the number of EDD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic;

    b. to ensure that its customer service operation was capable of providing reasonably adequate and effective assistance to Plaintiff who experienced fraud on Plaintiff's EDD Debit Card Account;

    c. to warn or notify Plaintiff that Plaintiff's EDD benefit funds were subject to, or at risk of being subject to, actual or suspected unauthorized use;

    d. to timely and adequately investigate and resolve Plaintiff's claims of unauthorized transactions involving Plaintiff's EDD Debit Card or Account;

    e. to extend provisional credit to Plaintiff when Plaintiff's fraud claims were not timely resolved;

    f. to freeze Plaintiff's Account only to protect Plaintiff from third-party fraud and only for the period necessary to conduct a reasonable investigation into whether third-party fraud occurred;

    g. to make EDD benefits deposited into Plaintiff's Account immediately available to Plaintiff and not to freeze Plaintiff's Account without a reasonable basis for believing that Plaintiff had committed fraud; and

///

h. to not freeze Plaintiff's Account out of concern for the Bank's own potential liability for third-party fraud.

204. Bank of America breached the implied covenant of good faith and fair dealing by, among other things:

   a. failing to take reasonable and necessary steps to safeguard Plaintiff's EDD benefits, including but not limited to:

      v. failing to issue Plaintiff an EDD Debit Card with EMV chip technology,

      vi. failing to secure Plaintiff's EDD Debit Card and Account information and other sensitive personal information that could be used by third parties to effect unauthorized transactions,

      vii. failing to adequately monitor for fraudulent or suspected fraudulent transactions on Plaintiff's EDD Debit Card and Account, and

      viii. failing to promptly issue Plaintiff an EDD Debit Card with an EMV chip and to increase its efforts with respect to securing Plaintiff's personal information, fraud monitoring, and otherwise safeguarding benefits in light of the foreseeable and actual rise in the number of EDD Debit Cardholders and the amount of financial fraud caused by, or related to, the COVID-19 pandemic;

   b. failing to ensure its customer service operation was capable of providing effective assistance to Plaintiff who experience fraud on Plaintiff's EDD Debit Card Account, during the COVID-19 pandemic;

   c. failing to warn or notify Plaintiff that Plaintiff's EDD benefits were and remain subject to, or at risk of being subject to, actual or suspected unauthorized use;

   d. failing to timely or adequately process and investigate Plaintiff's claims regarding unauthorized transactions;

   e. failing to extend provisional credit to Plaintiff when Plaintiff's fraud claims were not timely resolved;

///

f. freezing Plaintiff's EDD Debit Card Account without a reasonable basis for believing that the Plaintiff had committed fraud, and for longer than it would reasonably take to investigate any such belief;

g. failing to provide Plaintiff any reasonable means of contesting the Bank's purported basis for freezing Plaintiff's EDD Debit Card Account or for otherwise having Plaintiff's Account unfrozen; and

h. freezing Plaintiff's EDD Debit Card Account not to protect Plaintiff, but rather to protect the Bank itself, from liability for third-party fraud.

205. as a direct and proximate result of Bank of America's breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered actual losses and damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1. For declaratory preliminary and permanent injunctive relief ordering the Bank to take each of the following corrective actions:

   a. reopen Plaintiff's fraud claim and permanently credit Plaintiff for the amount of the reported fraud;

   b. unfreeze Plaintiff's EDD Debit Card Account that was frozen by the Bank;

   c. issue Plaintiff an EDD Debit Card with an EMV chip;

   d. provide an effective means, such as a secure request form on the Bank's website and an email address by which Plaintiff may easily initiate a fraud claim regarding unauthorized transactions on Plaintiff's EDD Debit Card Account.

2. for an award of all recoverable compensatory, statutory, and other damages sustained by Plaintiff, including treble damages where authorized by law, disgorgement, unjust enrichment, restitution, a declaration that the Bank holds the Account funds in constructive trust

63

for the benefit of Plaintiff, and all other available relief under applicable law, including but not limited to accrued interest for the periods during which Plaintiff was deprived of funds in Plaintiff's EDD Debit Card Account due to unauthorized transactions;

3. for an award of punitive damages pursuant to applicable law;

4. for reasonable attorney's fees and expenses as permitted by California Code of Civil Procedure §1021.5, 42 U.S.C. §1988, and any other applicable statute or law;

5. for taxable costs;

6. for pre- and post-judgment interest as allowed by law; and

7. for any other relief the Court deems just.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**SWIGART LAW GROUP, APC**

Date: June 11, 2021          By: _/s/ Joshua B. Swigart_
                                    Joshua B. Swigart, Esq.
                                    Josh@SwigartLawGroup.com
                                    Attorney for Plaintiff